OPINION. Beuoe, Judge: Petitioner’s actual average base period net income was a loss figure of $104,947.91.[1] Respondent admits that the elimination during the base period of petitioner’s seamless tube mill, the addition of new agencies to diversify its customers and geographic area, and the change to an electric resistance welding process for its tube manufacture constituted qualifying factors under section 722 (b) (4) of the Internal Revenue Code of 1939, and has allowed petitioner a constructive average base period net income of $91,550 for 1943, 1944, and 1945. Petitioner had computed its excess profits tax credit on the invested capital method which entitled it to a credit varying between $72,000 and $76,000 during the years 1940 through 1945. Petitioner now claims that it is entitled to a constructive average base period net income under section 722 (b) (4) of $239,642.83 “for the first excess profits tax taxable year” and $273,342.23 “for the second excess profits tax taxable year.” After a thorough consideration of the record, we believe that petitioner has not established its right to any increase in the $91,550 constructive average base period net income allowed by respondent. Pe-tioner has justified some adjustment to its average base period net income, but it falls far short of the constructive average base period net income which respondent will allow. seamless tube mill losses. -Petitioner, early in its base period, acquired and put into operation a seamless tube mill from which it had expectations of large profits. Troubles developed in the mechanical operation of the mill and in obtaining orders in sufficient quantity to justify its operation. The mill was closed down in 1938 and sold before the end of the base period at a substantial loss. Petitioner would adjust its base period income by seamless tube mill losses to be eliminated as follows: 1936-($33,773.20) 1937- (299,389.26) 1938_(131,343.15) 1939_ (318,565.84) Eespondent computes such adjustments to be as follows: 1936_ ($1,986.18) 1937_ (238,910.79) 1938__ (95,193.10) 1939_ (318,092.35) Petitioner’s computation of losses is from book figures and allocations of pertinent items between seamless and nonseamless business. Although these allocations were made by a witness long associated with petitioner, its operations and its books, her method of charging to the seamless tube operation various expenses which existed or continued with petitioner whether the seamless tube mill was being operated or not, cannot be accepted. Whatever its merit for cost accounting purposes, we see no justification for making an adjustment which is so far removed from realities in arriving at a determination of what is petitioner’s normal base period income. We conclude upon the entire record that petitioner is entitled to an adjustment to its average base period net income on account of its seamless tube losses in an amount less than that claimed by petitioner and larger than that computed by respondent. Even if we accepted petitioner’s adjustment for seamless tube losses, the constructive average base period net income would still be less than the $91,550 which respondent will allow. Diversified Sales Agencies Profits. Considerable dispute as to the facts relating to this issue have been resolved in the findings. Only a few of them are crucial to our conclusion. Petitioner appears to argue this issue as though it involved a commitment for a future change in capacity, but there is no basis upon which the commitment rule could operate. Factually the number of agencies did not increase after 1939. Petitioner contends that the facts disclose considerable growth of the agency business between 1938 and 1939 as compared with the growth of other sales, and that this is an appropriate occasion for the application of the “push-back” rule provided by the statute. Respondent urges that petitioner’s position is fallacious by reason of petitioner including in its other business all of its Detroit area sales which comprised home office sales and sales by agents operating in the Detroit area. We do not believe there could be any doubt that petitioner had “agencies” in the Detroit area. However, these existed prior to and continued during the base period. They were not part of petitioner’s 722 (b) (4) change in its method of doing business by representation by agencies in widespread geographic areas. For this reason we hold that the treatment of the Detroit agencies, including Eden, must be grouped for comparative purposes with all of its Detroit area sales. It is the new agencies with which we are concerned. Respondent, in an effort to show that petitioner’s reconstruction of this item would result in no benefit, takes the position that the 1938 seamless tube sales must be eliminated for the purposes of ascertaining the 1939 increased percentage of growth attributable to the new agencies. The new agencies in 1938 and 1939 sold only welded and fabricated welded tubes; and we have already accepted petitioner’s position that the seamless tube business resulted in losses in the base period years. A recomputation with the seamless tube sales eliminated, does not establish petitioner’s crucial premise that there was a greater percentage increase of 1939 new agencies sales over those for 1938 than existed in a similar comparison of Detroit area sales. It would demonstrate the fact that by 1939 petitioner had developed its full potential of its agency geographic diversification program. The equity of eliminating the seamless tube losses at this stage of the reconstruction is but one example of the difficulties presented in this issue. Others equally difficult relate to the fixing of an appropriate percentage of income to sales, and the choice of an appropriate index for back-casting, bearing in mind petitioner’s own base period history of losses. But these problems need not be resolved because in our judgment the record is replete with strong factual material that leads us to conclude that the new agency sales were not profitable, nor did they have prospects of being profitable. It is demonstrated that the new agency sales had extra expenses of freight and commissions incident to them; and the elimination of the seamless losses still left petitioner with substantial losses in 1938 and 1939, which are not shown not to have been attributable to the agency sales. Such a showing would indicate that if any increase in agency sales was to be reconstructed, the result would be an increased loss rather than increased profits. Petitioner has not established it is entitled to any greater relief by reason of having had a section 722 (b) (4) change in its method of doing business by the introduction of diversified agencies. Electric Resistance Welding. Here again petitioner seeks to make its case on a commitment during its base period to increase its capacity under its qualifying change after the base period and make its reconstruction on the basis of the post base period increased facilities. In a proper case, this can be done under the provision of section 722 (b) (4), which reads as follows: SEC. 722 (b) (4). * * * Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1,1940, * * * shall be deemed to be a change on December 31,1939, in the character of the business, * * * Petitioner contends that the pleadings place respondent in the position of having admitted that petitioner had a “commitment” with regard to its electric resistance welding qualifying factor. In connection with the change to electric resistance welding, petitioner, in paragraph 5 (h), alleged that respondent “erred in failing to make allowance as claimed under the commitment and push-back rule in the reconstruction of the base period income for the determination of an excess profits tax credit under section 722, for the amount of additional base period income for the change from gas weld process to the electric weld process of the production of welded tubes.” In his answer respondent denied that he had erred as alleged. In paragraph 6 of its petition, petitioner relied upon the following facts: “(f) The respondent and the Excess Profits Tax Council have conceded that the petitioner has established existence of a qualifying event under section 722 (b) (4), resulting from the program adopted prior to December 31, 1939, and to which petitioner was committed, for the changeover from gas to electric welding.” In his answer respondent, with reference to paragraph 6 “(e) to (h) inclusive” stated “admits the allegations of fact contained in subparagraphs (d) to (h) inclusive of paragraph 6 of the petition.” At the commencement of the hearing, the parties discussed the state of the pleadings, at which time respondent took the position that his admission of the factual allegations in paragraph 6 (f) of the petition might be subject to misinterpretation, but that he never intended to admit in his pleadings that the petitioner had any commitments for any future changes in capacity for production or operation within the meaning of section 722 (b) (4) and leave was given for him to file an amendment to answer wherein he averred “that neither respondent nor the Excess Profits Tax Council recognizes or has ever recognized a commitment by the petitioner for a change in capacity for production or operation, as defined in the last sentence of section 722 (b) (4) of the Internal Revenue Code, based upon petitioner’s changeover from gas to electric welding.” Respondent further alleged that the Excess Profits Tax Council had determined that the change from gas to electric welding, which petitioner actually accomplished in 1939, constituted a “change in character” and that any reconstruction based upon this change in character must be based on petitioner’s business as constituted on December 81, 1939, and not upon a commitment for a future change in capacity. Petitioner’s reply to respondent’s amendment to answer was that petitioner was without knowledge as to the truth of the averments, denied them, and demanded strict proof thereof. We view the pleadings as constituting no concession by the respondent that petitioner was committed to a change in capacity for production or operation within the meaning of section 722 (b) (4). We believe that in nowise has the present state of the pleadings shifted a burden of proof as to the existence of such a commitment from petitioner to respondent. Respondent has always denied that he erred in failing to make allowance as claimed under the commitment and push-back rule in reconstruction of petitioner’s base period income. He has made no affirmative allegations which require proof on his part in order to sustain this position. At the time of the hearing, inquiry was made of petitioner’s counsel as to whether the filing of the respondent’s amendment to answer entailed any surprise or required a continuance in order for him to proceed with his case. The reply was in the negative. In our judgment, petitioner has not demonstrated that it was committed to a change from gas to electric welding after the base period. Petitioner’s evidence does show that it was interested in the electric resistance welding process but the evidence falls short of a well established intention to make the conversions urged by petitioner. Moreover, the facts demonstrate only a very limited conversion. There are further reasons why petitioner cannot prevail on this issue. Petitioner makes its entire reconstruction on the premise that its reconstructed capacity would have permitted it during the base period to sell electric resistance welding tubing to its customers in equal amounts as it had sold them gas welded tubing. When it is recalled that the gas welded tubing had sufficed for the purpose for which it was sold and, perhaps more to the point, that gas welded tubing sold for 5 per cent less than electric resistance welded tubing during the base period, except for 1939 when the differential was 3 per cent, it is incredible to conclude that comparable sales of electric resistance tubing could have been made. Although electric resistance welded tubing had possible advantages over gas welded tubing, these advantages did not concern those who were already using the gas welded product. There is no showing as to the extent of availability of customers for the new products, other than those who were already satisfactorily using the old product. The automobile business is an example of the highly competitive field in which petitioner was engaged and such a price differential would be crucial. At least petitioner made no effort to prove the contrary; and we are not able to assume that petitioner’s premise is correct. This Achilles’ heel to petitioner’s case can lead to no conclusion other than that relief on this factor cannot be granted. In view of the foregoing, our conclusion must be that petitioner has not justified any increase in its constructive average base period net income by reason of its claims relating to the change from gas welding to electric resistance welding. Our over-all conclusion is that the petitioner has not established its right to any effective relief and that the relief already granted to petitioner by respondent is generous. Respondent concedes that this Court’s holding in Nivison-Weiskopf Co., 18 T. C. 1025, eliminates its application of E. P. C. 29 (1948-1 C. B. 90), which had caused respondent to limit petitioner’s excess profits tax credit for 1942 to its invested capital credit. But respondent contends the limitation should still be made by reason of his application of the variable credit rule. That rule is of moment primarily in commitment cases or situations where the change was immediately before the end of the year, and we have concluded that there is no such situation here which would result in any relief. In this posture of the case, since petitioner has failed to justify a constructive average base period net income in excess of that allowed to it by respondent, we leave this case as we found it. Petitioner is granted no increased constructive average base period net income. Reviewed by the Special Division. Decision will entered under Bide 50. 1936- $79,795.17 ! 1938_ ($150,827.57) 1937- 7, 014. 84 I 1939_ (355, 774. 09)